UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| WESTPORT INSURANCE CORPORATION, | ) ) ) | |
| Plaintiff | ) ) | CA No. 1:05-cv-11780 DPW |
| v. | ) ) | |
| RICHARD C. HEIDLAGE, et al., | ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM OF LAW IN SUPPORT OF WESTPORT'S RENEWED MOTION FOR SUMMARY JUDGMENT

Plaintiff Westport Insurance Corporation ("Westport"), by its undersigned attorneys, submits this Memorandum of Law in support of its Renewed Motion for Summary Judgment on its Complaint for Declaratory Judgment and on the Counterclaim of Richard C. Heidlage.

## INTRODUCTION

In this action, Westport seeks a declaration that it does not have a duty to defend or indemnify Richard C. Heidlage ("Heidlage") in a Florida legal malpractice action in which his defense is being jointly funded by Westport and Great American Insurance Company. The Westport policy was issued to Kotin, Crabtree & Strong, LLP, with whom Heidlage was associated beginning on May 1, 2002. Prior to that date, Heidlage was of counsel to Prince, Lobel, Glovsky & Tye, LLP, Great American's named insured.

Westport contends that it is entitled to summary judgment on the basis of an endorsement that excludes coverage for claims based on acts, errors or omissions that the claimant alleges were committed prior to May 1, 2002. On June 5, 2006, Westport filed a motion for summary judgment, which was followed by Heidlage's cross-motion for partial summary judgment on

October 13, 2006. Westport's motion was supported, in part, by the deposition testimony of malpractice plaintiff Charles Zalis, who testified that Heidlage did nothing wrong after May 1, 2002. In its opposition brief, Westport noted that in their expert disclosure filed on October 11, 2006, the malpractice plaintiffs disclosed that their legal expert, Scott Feder, would testify that Kotin, Crabtree & Strong did not depart from the applicable standard of care.

On January 26, 2007, the Court denied Westport's motion and granted Heidlage's motion, finding that Westport had a duty to defend. The Court awarded attorney's fees to Heidlage, which were later stipulated to total $52,300 through January 31, 2007, and paid by Westport.

The Court further ordered the parties to file a status report on June 1, 2007, outlining any material developments in the Florida malpractice action, followed by reports every two months thereafter. In a Joint Status Report filed on June 1, 2007, the parties reported that on April 4, 2007, the malpractice plaintiffs had filed a response to a request to admit in which they admitted that "all acts of alleged professional negligence that You claim Heidlage committed occurred before May 1, 2002."

During a status conference on August 9, 2007, counsel for Westport reported that plaintiffs'' legal expert Scott Feder testified in his deposition testimony on June 1, 2007, that Heidlage did not commit any acts of malpractice after May 1, 2002. At the conclusion of the conference, the Court granted Westport leave to file the instant motion for summary judgment.

## STATEMENT OF UNDISPUTED MATERIAL FACTS[1]

**I.     HEIDLAGE'S ASSOCIATION WITH THE PRINCE, LOBEL AND KOTIN, CRABTREE FIRMS**

1.     For several years prior to May 1, 2002, Heidlage was of counsel to Prince, Lobel, Glovsky & Tye, LLP ("Prince, Lobel"). *Affidavit of Ellen A. McCarthy ("McCarthy Aff.")*, ¶ 4, Exhibit A.

2.     Great American Insurance Company is the professional liability insurer for Prince, Lobel. *McCarthy Aff.*, ¶ 7; *Answer of Kotin, Crabtree & Strong, LLP*, ¶ 29.

3.     On May 1, 2002, Heidlage left Prince, Lobel and joined Kotin, Crabtree & Strong, LLP ("Kotin, Crabtree") as an of counsel attorney. *Heidlage Counterclaim*, ¶ 5.

**II.     THE WESTPORT POLICY**

4.     Westport issued Lawyers Professional Liability Policy No. MAL008857, effective March 8, 2002 to March 8, 2003 on a claims made and reported basis, to Kotin, Crabtree. *Complaint*, ¶ 23; *Answer of Kotin, Crabtree & Strong, LLP*, ¶ 23.

5.     The Policy contains the following endorsement excluding coverage for claims based on acts, errors or omissions allegedly committed by Heidlage prior to May 1, 2002:

LIMITATION OF INDIVIDUAL PRIOR ACTS
* * *
This POLICY shall not apply to any CLAIM based upon, arising out of, attributable to, or directly or indirectly resulting from any act, error, omission or PERSONAL INJURY committed by the following INSURED(S) prior to the corresponding RETROACTIVE DATE(S):

Richard C. Heidlage – 05.01.2002

*McCarthy Aff.*, ¶¶ 3-4, Exhibit A.

---

[1] / Unless specified otherwise, the affidavits and exhibits referred to herein were filed on June 5, 2006, or on November 13, 2006, in support of Westport's Motion for Summary Judgment and Westport's Opposition to Heidlage's Cross-Motion for Partial Summary Judgment, respectively, and are incorporated herein.

6.      The Policy contains the following definition of "Retroactive Date:"

"RETROACTIVE DATE" MEANS the date, as specified in the declarations or in any endorsement attached hereto, on or after which any WRONGFUL ACT, as defined in each of the attached COVERAGE UNITS, must have occurred in order for CLAIMS arising therefrom to be covered under this POLICY. CLAIMS arising from any WRONGFUL ACT, as defined in each of the attached COVERAGE UNITS, occurring prior to this date are not covered by this POLICY;

*McCarthy Aff.*, ¶¶ 3-4, Exhibit A.

## III.    ALLEGATIONS IN THE UNDERLYING MALPRACTICE COMPLAINT

### A.      The Zalis v. Gersten Lawsuit

7.      On or about May 14, 2003, Charles N. Zalis ("Zalis"); the Charles N. Zalis Limited Partnership ("limited Partnership"); North American Underwriting Managers, Inc. ("NAUM"); and North American Underwriting Managers Insurance Agency, Inc. filed a Complaint alleging legal malpractice against Heidlage, Prince, Lobel, and others in the Circuit Court of the 11th Judicial Circuit, Miami-Dade County, Florida, Case No. 03-011784 CA 30. *Heidlage Counterclaim*, ¶3.

8.      Westport's named insured, Kotin, Crabtree, was not sued. *Id.*

9.      A Second Amended Complaint naming Heidlage, Prince, Lobel, Broad & Cassel, P.A., Franklin L. Zemel, P.A., and Franklin L. Zemel, was filed on or about January 3, 2005 ("underlying complaint"). *Heidlage Counterclaim*, ¶ 3.[2]

10.     The following is alleged in the underlying complaint: In 1997, NAUM, a Florida wholesale life insurance business owned by Zalis through the Limited Partnership, merged with Gersten Financial & Insurance Company ("Gersten Financial"), a Massachusetts retail life insurance business owned by Allan Gersten ("Gersten"). *Complaint*, Exhibit A, ¶ 16.

---

[2] / A copy of the underlying complaint is attached as Exhibit A to Westport's Complaint for Declaratory Judgment.

11.    Zalis alleges that Gersten failed to assign a substantial amount of commissions to NAUM; falsified the books of NAUM by failing to account for payments made to him, making it appear as though he was still owed that money; registered NAUM's web site and E-mail accounts in his name only; failed to split the net proceeds of the business evenly; used NAUM money to repair an office building owned by him and his wife; paid excessive salaries to his relatives; paid personal expenses out of company funds; and refused to pay legitimate expenses associated with NAUM's Florida office. *Complaint*, Exhibit A, ¶¶ 25-26.

12.    In January 2001, Zalis, the Limited Partnership and NAUM ("Zalis plaintiffs") filed an action against Gersten and Gersten Financial (collectively "Gersten") in state court in Florida, subsequently removed to the United States District Court for the Southern District of Florida, Case No. 01-0432-CIV-GOLD/SIMONTON ("Zalis v. Gersten lawsuit"). *Complaint*, Exhibit A, ¶¶ 30, 32.

13.    In July 2001, Heidlage, then with Prince, Lobel, appeared on behalf of the Zalis plaintiffs. *Complaint*, Exhibit A, ¶ 33.

14.    In September 2001, Heidlage and Prince, Lobel assumed the role of lead counsel. *Complaint*, Exhibit A, ¶ 36.

15.    In January 2002, Franklin Zemel and Broad & Cassel assumed the role of lead counsel. ¶ 37.

16.    In March 2002, Richard Brodsky substituted for Zemel and Broad & Cassel as co-counsel for the Zalis plaintiffs, and in June 2002 became lead counsel *Complaint*, Exhibit A, ¶¶ 38, 40.

17.    During trial in August 2002, the Zalis plaintiffs agreed to settle for an amount less

than the attorneys' fees and costs incurred by Zalis to prosecute the case. *Complaint*, Exhibit A, ¶ 41.

**B.    Alleged Legal Malpractice**

18.    In the underlying complaint, Zalis, the Limited Partnership and NAUM allege that they were forced to accept a disadvantageous settlement because various acts of legal malpractice restricted their ability to prove liability and damages. *Complaint*, Exhibit A, ¶ 41.

19.    The following acts, errors or omissions are alleged against Heidlage and Prince, Lobel:

### Inadequacies of the Amended Complaint

- Failure to include claims for breach of contract and unjust enrichment or quasi contract in the First Amended Complaint, although those claims had been included in the original Complaint. *Complaint*, Exhibit A, ¶ 43.a.i.

- Failure to name North American Underwriting Managers Insurance Agency, Inc. as a defendant. *Complaint*, Exhibit A, ¶ 43.a.ii.

### Failure to Name an Expert Witness or Witnesses

- Failure to name an expert witness by the November 2, 2001 deadline imposed by the court, or by the February 15, 2002 extension agreed on by the parties. *Complaint*, Exhibit A, ¶ 43.b.

### Inadequate Discovery Efforts

- Failure to move to compel Gersten to produce banking and other financial documents until May 2002, as a result of which the motion was denied as untimely. *Complaint*, Exhibit A, ¶ 43.c.i.

- Failure to depose Gersten's accountant, who allegedly advised Gersten that he

was failing to live up to his obligations to Zalis. *Complaint*, Exhibit A, ¶ 43.c.ii.

- Failure to obtain documents from various insurance companies to disprove Gersten's counterclaim that Zalis had misappropriated funds due the joint venture by depositing funds generated by the joint business into a preexisting NAUM bank account. *Complaint*, Exhibit A, ¶ 43.c.iii.

### Failure to Renew Claim for Preliminary Relief

- Failure to renew the motion to appoint a receiver or to otherwise seek emergency relief to freeze substantial funds for end-of-year bonuses and commissions due to be paid, which motion had been made and granted in state court, but then abrogated by removal of the case to federal court. *Complaint*, Exhibit A, 43.d.

**B.    Orders and Rulings in the Zalis v. Gersten Lawsuit**

20.    On August 20, 2001, the court in the Zalis v. Gersten action entered a scheduling order setting the following deadlines, among others:

> November 16, 2001  - all non-expert discovery to be completed
>
> November 2, 2001 -  plaintiffs to disclose experts
>
> December 3, 2001  - defendants to disclose experts
>
> February 1, 2002 – all expert discovery to be completed
>
> March 1, 2002 – all dispositive motions must be filed
>
> June 17, 2002 – trial

*Affidavit of Robert A. Chaney ("Chaney Aff.")*, ¶ 2, Exhibit A.

21.    On October 2, 2001, the court granted plaintiffs' motion for leave to file a First Amended Complaint, which omitted counts for breach of contract and unjust enrichment or quasi contract included in the original Complaint. *Chaney Aff.*, ¶ 3-4, Exhibit B, C.

22.     On April 17, 2002, the Gersten defendants filed a Motion for Sanctions and/or to Strike the Pleadings of the Plaintiffs for Failure to Comply with Pretrial Order and Motion to Exclude Plaintiffs' Expert Witnesses. *Chaney Aff.*, ¶ 7, Exhibit F.

23.     Therein, the defendants stated that the parties had agreed to extend expert disclosure to February 15, 2002, for the plaintiffs, and March 1, 2002, for the defendants. *Id.* at p. 2.

24.     In a response filed on April 29, 2002, the Zalis plaintiffs stated the following:

> Finally, as to the request that Plaintiffs be barred from listing an expert witness, Plaintiffs have not listed an expert witness and have not sought leave to list an expert witness. Not every case needs an expert witness to succeed. Plaintiffs' is one of them.

*Chaney Aff.*, ¶ 8, Exhibit G, p. 5.

25.     On June 6, 2002, the defendants filed a Motion to Strike Plaintiffs' Summary of Damages Claim and Use of Summaries; (2) to Exclude Testimony of Ronald Rice, CPA; and (3) to Exclude Testimony of Charles Zalis on Loss of Value of Business. *Chaney Aff.*, ¶ 10, Exhibit I.

26.     Therein, the defendants argued that plaintiffs' summary of damages claim required expert testimony, and that although Rice was labeled as a "summary witness," plaintiffs actually intended to use him as an expert. *Id.* at pp. 3-8.

27.     The defendants further contended that Zalis had insufficient knowledge of the day-to-day operations of the business and the financial record to testify concerning the value of the business, and therefore the plaintiffs required an expert to prove the loss of value of the business. *Chaney Aff.*, ¶ 10, Exhibit I., pp. 8-14.27.

28.     On July 12, 2002, the plaintiffs filed a Motion for Leave to Amend First Amended Complaint, with a proposed Second Amended Complaint adding a count based on quasi-contract

and unjust enrichment, and for breach of contract. *Chaney Aff.*, ¶ 11, 14, Exhibits J, M.

29.    On July 29, 2002, the magistrate judge entered an Omnibus Order and

Recommendations denying plaintiffs' motion on the following basis:

> Prejudice and undue delay are inherent in an amendment asserted after close of
> discovery and after the time has expired for filing dispositive motions. (citations
> omitted)
>                                    * * *
> Therefore, . . . the undersigned Magistrate Judge finds and concludes that . . . the
> Defendants would be unduly prejudiced if the amended complaint were permitted
> at this time.

*Chaney Aff.*, ¶ 12, Exhibit J, p.15.

30.    The magistrate also granted the Gersten defendants' motion to exclude the

testimony of Zalis as to damages and the value of NAUM. *Id.* at pp. 16-20, 41.

## IV.    DISCOVERY IN THE UNDERLYING MALPRACTICE SUIT

31.    In the underlying Florida malpractice action, Charles Zalis was deposed and

testified as follows as to whether Heidlage committed malpractice after May 1, 2002:

> Question:    Is it fair to say that as of May 1st, 2002, whatever you contend Mr.
>              Heidlage did wrong in his representation of you had already happened?
>
> Answer:      In my opinion, yes.
>
> Question:    And that he did not do anything wrong in your opinion after that
>              date?
>
> Answer:      I don't think it mattered. Whether it was wrong or right, I think it was
>              over.

*Chaney Aff.*, ¶ 13, Exhibit L.

32.    On October 11, 2006, the plaintiffs in the underlying lawsuit served their expert

witness disclosure including the following opinions of their legal expert, Scott Jay Feder:

> Substance of Facts and Opinions – Mr. Feder will testify that Richard Heidlage,
>
> Esq. and Prince Lobel failed to meet the applicable standard of care regarding:

a. Designation of an expert witness or witnesses;

b. Preparation and filing of the Amended Complaint which deleted the breach of contract and unjust enrichment counts; and

c. Failure to pursue the claim for preliminary relief after the case was removed from state court to federal court in early 2001.

Additionally, Mr. Feder will testify that:

a. Richard Brodsky, Esq. did not depart from the applicable standard of care under the circumstances, including his late involvement and the limited nature of his role until late April, 2002 when he became lead counsel;

b. Kotin Crabtree did not depart from the applicable standard of care under the circumstances;

c. Zemel Franklin, Esq. departed from the applicable standard of care; and

d. Mr. Feder will also testify that in his opinion the negligence of the Defendants was the proximate cause of damage to the Plaintiffs.

*Second Affidavit of Robert A. Chaney* ("*Second Chaney Aff.*"), ¶ 2, Exhibit A, pp.2-3.

33.    On April 4, 2007, the malpractice plaintiffs served responses to the First Request

for Admissions of Prince, Lobel, in which they admitted the following:

30. Admit that all acts of alleged professional negligence that You claim Heidlage committed occurred before May 1, 2002.

*Joint Status Report*, filed by Westport and Heidlage on June 1, 2007.

34.    On May 31 and June 1, 2007, the deposition of malpractice plaintiffs' expert Scott

Feder was taken in the underlying case. Mr. Feder's testimony including the following:

Q. And one of the other opinions is that Kotin, Crabtee law firm did not depart from the applicable standard of care under the circumstances is that because they did not (sic), Mr. Heidlage did not become of counsel to firm until May 1st of 2002

A. Exactly.

Q.    If Kotin, Crabtree did not deviate from the standard of care as of May 1st, would you agree that Mr. Heidlage did not commit any acts of malpractice. Strike that.
Would you agree then that as of May 1, 2002, Mr. Heidlage did not deviate from the standard of care?

Mr. Bales:    As of May 1st.

Mr. Lowe:    After May 1st.

Mr. Nathan:    Object to the form.

The Witness:    The question is, after May 1st, in my opinion, the dye (sic) was cast, as an expression, the red lights had been run, the accident had happened.
And so I guess I'm agreeing with what you said that after May 1st, no, there was no further malpractice at that point that caused damage, that resulted in damage.

* * *

Q.    When was the latest date that you believe that a – the latest date that you believe that acts of malpractice occurred?

A.    Approximately, that first week of March [2002], in terms of the pleadings. And about the exact same time in terms of expert witnesses. And mainly end of the year, or very beginning of – end of 2001 or very beginning of 2002 in terms of the injunctive relief.

*Third Affidavit of Robert A. Chaney*, Feder Deposition, pp. 266-267, 276-278 (attached hereto).

## V.    THE JOINT DEFENSE OF HEIDLAGE

35.    Heidlage's defense costs are being shared by Westport and Great American Insurance Company. *Westport Complaint*, ¶¶ 28-29; *Heidlage Answer*, ¶¶ 28-29.

36.    Heidlage is being defended by independent defense counsel selected by him. Heidlage's defense is not being controlled by Westport. *Second Chaney Aff.*, ¶ 3, Exhibit B, pp. 33-36, 38-40.

36.    The Great American policy provides a $10,000,000 limit of liability. *McCarthy Aff.*, ¶ 8.

## ARGUMENT

### I. THE MALPRACTICE CLAIM IS NOT BASED ON ACTS, ERRORS OR OMISSIONS COMMITTED AFTER THE RETROACTIVE DATE

Claims made policies may provide coverage for claims irrespective of the timing of the acts, errors or omissions giving rise to the claim. Such policies, however, routinely limit coverage to claims arising out of acts, errors or omissions occurring after a specified date, commonly referred to as the "retroactive date." *See James J. Mawn Enterprises, Inc. v. Liquor Liab. Joint Underwriting Assoc.*, 42 Mass.App.Ct. 417, 420, 677 N.E.2d 1162, 1164 (1997). Here, the Westport Policy provides full prior acts coverage, with the exception that pursuant to the Limitation of Prior Acts Endorsement, claims are excluded that are "based upon, arising out of or attributable to, or directly or indirectly resulting from an act, error, [or] omission" committed by Richard Heidlage prior to May 1, 2002, the date that Heidlage joined Kotin, Crabtree & Strong, the named insured, as an of counsel attorney.

Courts applying Massachusetts law have enforced similar prior acts or retroactive date limitations. *See James J. Mawn Enterprises*, 42 Mass.App.Ct. 417, 677 N.E.2d 1162 (1997) (retroactive date coinciding with effective date of policy is valid and enforceable); *See also Invensys Systems, Inc. v. Centennial Ins. Co.*, 473 F.Supp.2d 211 (D.Mass. 2007); *Aviles v. Mier*, 2005 Mass.Super. LEXIS, *aff'd*, 67 Mass.App.Ct. 1117, 857 N.E.2d 508; *Derrah v. Shorton*, 12 Mass.L.Rep. 258, 2000 Mass.Super. LEXIS 326.

Courts in many other jurisdictions have also enforced retroactive date provisions or prior acts exclusions contained in claims made policies. *See, e.g., Colip v. Clare*, 26 F.3d 712 (7th Cir. 1994); *Coregis Ins. Co. v. Blancato*, 75 F.Supp.2d 319 (S.D.N.Y. 1999); *RHI Holdings, Inc. v. National Union Fire Ins. Co.*, 1994 WL 167946 (E.D.Pa. 1994); *Yazoo County, Miss. v.*

*International Surplus Lines Ins. Co.*, 616 F.Supp. 153 (S.D.Miss. 1985); *Daly v. Ass'n of Trial Lawyers Assur. Mut.*, 1994 WL 144906 (E.D.Pa.); *Hutchinson III v. Attorneys Ins. Mut. of Alabama, Inc.*, 631 So.2d 975 (Ala. 1994); *General Ins. Co. v. McManus, Inc.*, 650 N.E.2d 1080 (Ill.App. 1995); *30 West 15th Street Owners Corp. v. Travelers Ins. Co.*, 165 A.D.2d 731, 563 N.Y.S.2d 784 (1st Dept. 1990); *Matthew v. Home Ins. Co.*, 916 S.W.2d 666 (Tex.Ct.App. 1996).

Westport will not burden the Court with a repetition of its prior argument concerning the orders and rulings in the Zalis v. Gersten lawsuit on which the allegations in the malpractice complaint are based. *See Westport's Memorandum of Law*, pp. 14-16. Westport contends that the orders and rulings show that the malpractice claim against Heidlage is based on malpractice that occurred, if at all, prior to May 1, 2002 retroactive date, and that nothing could have been done subsequent to that date to remedy the alleged malpractice.

In any event, discovery in the malpractice action has now conclusively established that the claim is not based on any acts, errors or omissions committed by Heidlage when he was associated with Kotin, Crabtree beginning on May 1, 2002.[3]  In his deposition on June 1, 2005, Charles Zalis, principal of the plaintiffs in the malpractice suit, acknowledged that everything he contends Heidlage did wrong "had already happened" by May 1, 2002, and that Heidlage "did not do anything wrong in . . .[his] opinion after that date."[4]  Far from backing away from this testimony, on April 4, 2007, the malpractice plaintiffs served responses to Prince, Lobel's First Request for Admissions, in which the following was admitted:

---

[3] / Under Massachusetts law, an insurer may in a declaratory judgment action present evidence to establish that the insurer does not have a duty to defend. *See, e.g., National Cas. Co. v. Bennett*, 1998 Mass.Super. LEXIS 446, *5-6 ("An insurance company which contests a duty to defend should bring a declaratory judgment action . . . and seek to determine facts which show that the claim is not covered.")

[4] / In the underlying complaint, Zalis is alleged to be the general partner of the Charles N. Zalis Family Limited Partnership. *Complaint*, Exhibit A, ¶ 4.  Zalis is also the former registered agent, president and a director of North American Underwriting Managers, Inc., a dissolved corporation, the only other plaintiff in the malpractice action other than Zalis himself.

31.    Admit that all acts of alleged professional negligence that You
claim Heidlage committed occurred before May 1, 2002.

In response to Westport's prior motion for summary judgment, Heidlage argued that

Zalis's testimony was not dispositive because he is a layman and his testimony could be

contradicted by plaintiffs' expert. Heidlage noted that "[t]o date, the parties in the underlying

malpractice action have not exchanged expert reports or otherwise discovered what expert

testimony will be attempted to be introduced at trial." *Heidlage's Mem.*, p. 5.

That is no longer the case. On May 31-June 1, 2007, the deposition of Scott Feder, the

malpractice plaintiffs' legal expert, was taken. Feder testified as follows with respect to post-

May 1, 2002 malpractice:

Q.    And one of the other opinions is that Kotin, Crabtee law firm did not
depart from the applicable standard of care under the circumstances is that
because they did not, Mr. Heidlage did not become of counsel to firm until
May 1st of 2002

A.    Exactly.

Q.    If Kotin, Crabtree did not deviate from the standard of care as of May 1st,
would you agree that Mr. Heidlage did not commit any acts of
malpractice. Strike that.
Would you agree then that as of May 1, 2002, Mr. Heidlage did not
deviate from the standard of care?

Mr. Bales:    As of May 1st.

Mr. Lowe:    After May 1st.

Mr. Nathan:    Object to the form.

The Witness:    The question is, after May 1st, in my opinion, the dye (sic) was
cast, as an expression, the red lights had been run, the accident had
happened.
And so I guess I'm agreeing with what you said that after May 1st,
no, there was no further malpractice at that point that caused
damage, that resulted in damage.

* * *

Q.      When was the latest date that you believe that a – the latest date that you believe that acts of malpractice occurred?

A.      Approximately, that first week of March [2002], in terms of the pleadings. And about the exact same time in terms of expert witnesses. And mainly end of the year, or very beginning of – end of 2001 or very beginning of 2002 in terms of the injunctive relief.

Thus, the Zalis plaintiffs' expert witness is now on record with an opinion that is fully consistent with Charles Zalis's testimony in 2005.[5] Feder's testimony eliminates any remaining doubt as to whether the malpractice claim against Heidlage potentially falls within the coverage provided by the Westport policy. There can be no reasonable dispute that the claim is based entirely on alleged malpractice that had already occurred as of May 1, 2002, and that the malpractice plaintiffs assert no claim based on post-May 1, 2002 conduct. Therefore, the Limitation of Prior Acts Endorsement precludes any defense obligation for the claim against Richard Heidlage.

Westport should now be permitted to withdraw from funding a share of Heidlage's defense costs. Heidlage has been defended throughout by independent counsel selected by him, and has controlled his own defense. As Great American would be liable for the entire cost of Heidlage's defense, Heidlage would not be prejudiced by Westport's withdrawal at this time.

---

[5] / Feder's testimony came as no surprise, as the malpractice plaintiffs disclosed in their expert witness disclosures served on October 11, 2006, that Feder would testify that (1) Westport's named insured, Kotin, Crabtree, did not depart from the applicable standard of care; and that (2) Richard Brodsky did not depart from the applicable standard of care because his role was limited until late April 2002. Brodsky, like Kotin, Crabltree was not sued. Feder's opinion that Brodsky did not commit any malpractice and that he could not have cured Heidlage's alleged malpractice as of April 2002, is further indicative of the fact that the malpractice claim against Heidlage is not based on any post-May 1, 2002 malpractice. Feder confirmed in his deposition that the expert disclosure accurately reflected his opinion. Feder Deposition, pp. 55-57 (*Third Affidavit of Robert A Chaney* Affidavit, Exhibit A).

## II.    WESTPORT HAS NO DUTY TO INDEMNIFY

As Westport has no duty to defend Heidlage, it "necessarily follows" that Westport can have no duty to indemnify Heidlage for any judgment entered against him with respect to the malpractice action. *Bagley v. Monticello Ins. Co.*, 430 Mass. 454, 720 N.E.2d 813, 817 (Mass. 1999); *See also Liberty Mut. Ins. Co. v. Metropolitan Life Ins. Co.*, 260 F.3d 54, 62 (1st Cir. 2001); *Transamerica Ins. Co. v. KMS Patriots, L.P.*, 52 Mass.App.Ct. 189, 752 N.E.2d 777, 783 (2001). Therefore, the Court's order should also provide that Westport has no duty to indemnify Heidlage.

## C.    HEIDLAGE'S COUNTERCLAIM SHOULD BE DISMISSED

The Court previously awarded attorney's fees to Heidlage, and Westport paid $52,300 to Heidlage for fees incurred in this action through January 31, 2007. Westport submits that irrespective of the outcome of Westport's renewed motion for summary judgment, the Court should deny any request for a further award of attorney's fees, and that Heidlage's Counterclaim under M.G.L. c. 176D and 93A, §§ 2 and 11, should be dismissed. *See Polaroid Corp. v. Travelers Indem. Corp.*, 414 Mass. 747, 754, 610 N.E.2d 912 (1993) (If "an insurer could reasonably have concluded that no aspect of the [insured's] claims was within the scope of coverage and that, therefore, there was no duty to defend [the insured] . . .an insurer's refusal to defend, even if ultimately determined to be wrong, does not support a claim under G.L.c. 93A); *See also LaFrance v. Travelers Ins. Co.*, 32 Mass.App.Ct. 987, 594 N.E.2d 550, 551 (1992); *Webb v. Metropolitan Property & Cas. Ins. Co.*, 1996 Mass.Super. LEXIS 320, *7; *Hillcrest Educational Center, Inc. v. Continental Ins. Co.*, 1995 Mass.Super. LEXIS 582, *9; *SCA Disposal Services of New England, Inc. v. Central National Ins. Co.*, 1994 Mass. Super. LEXIS 617.

## CONCLUSION

For the reasons stated above, Westport respectfully requests that this Honorable Court grant summary judgment in favor of Westport and against Richard C. Heidlage and Kotin, Crabtree & Strong, LLP on Westport's Complaint for Declaratory Judgment; that the Court grant summary judgment in favor of Westport and against Richard C. Heidlage on Heidlage's Counterclaim; and, that the Court enter a declaration that Westport has no duty to defend or indemnify Heidlage in the underlying legal malpractice action, and that Westport may withdraw from the defense of Heidlage undertaken jointly with Great American Insurance Company.

Respectfully submitted,

WESTPORT INSURANCE CORPORATION

By:    */s/ Steven J. Bolotin*
       Steven J. Bolotin

Steven J. Bolotin
BBO #564085
Morrison Mahoney LLP
250 Summer Street
Boston, MA 02210
(617) 439-7500

George J. Manos
Robert A. Chaney
Bollinger, Ruberry& Garvey
500 West Madison Street
Suite 2300
Chicago, Illinois 60661
(312) 466-800
(312) 466-8001 (fax)

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| WESTPORT INSURANCE CORPORATION, | ) ) ) | |
| Plaintiff | ) ) | |
| v. | ) ) | CA No. 1:05-cv-11780 DPW |
| RICHARD C. HEIDLAGE, et al., | ) ) ) | |
| Defendants. | ) ) | |

## THIRD AFFIDAVIT OF ROBERT A. CHANEY

I, Robert A. Chaney, state under the penalties of perjury the following:

1.    I am a partner with the law firm of Bollinger, Ruberrry & Garvey, and am one of the attorneys for Westport Insurance Corporation ("Westport") in this lawsuit. I make this affidavit in support of Westport's Renewed Motion for Summary Judgment.

2.    Attached hereto as Exhibit A is a true and accurate copy of pages 55-57; 266-267; and 276-278 from the transcript of the deposition testimony of Scott Jay Feder, taken on May 31 and June 1, 2007, in *Charles N. Zalis, et al., Plaintiffs vs. Prince, Lobel, Glovsky & Tye, LLP, et al.*, case No. 03-10784 CA 30, in the Circuit Court of the 11th Judicial Circuit  in and for  Miami-Dade County, Florida.

                    */s/  Robert A. Chaney*
                    Robert A. Chaney

1084000v1

# EXHIBIT A

1  IN THE CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT
     IN AND FOR MIAMI-DADE COUNTY, FLORIDA
2            CASE NO. 03-10784 CA 30

3

4

   CHARLES N. ZALIS,
5  individually, et al.,

6       Plaintiffs,

7  v.

8  PRINCE, LOBEL, GLOVSKY &
   TYE, LLP, a Massachusetts
9  limited liability partnership,
   et al.,
10

        Defendant.
11  _____/

12

13

14              VOLUME I

15            DEPOSITION

16               OF

17          SCOTT JAY FEDER, ESQ.

18

19

20

21       9130 South Dadeland Boulevard
              Miami, Florida
22

23

24       Thursday, May 31, 2007
         9:50 a.m. - 4:50 p.m.
25

RECEIVED
JUN 13 2007
By PIROK

KRESSE & ASSOCIATES, INC
305-371-7692

**Page 2**

APPEARANCES

For the Plaintiffs:

  RICHARD M. BALES, JR., Esquire
  BALES, SOMMERS & KLEIN
  One Biscayne Tower, Suite 1881
  Two South Biscayne Boulevard
  Miami, Florida  33131

Appellate Counsel for the Plaintiffs:

  MARTIN L. NATHAN, Esquire
  NATHAN & HAUSER
  700 Rivergate Plaza
  444 Brickell Avenue
  Miami, Florida  33131

For the Defendant, Richard Heidlage:

  JOSEPH H. LOWE, Esquire
  JEFFREY D. SWARTZ, Esquire
  STEPHENS, LYNN, KLEIN, LACAVA,
  HOFFMAN & PUYA, P.A.
  Two Datran Center, PH II
  9130 South Dadeland Boulevard
  Miami, Florida  33156

For the Defendant, Prince, Lobel,
Glovsky & Tye, LLP:

  JOSEPH W. BEASLEY, Esquire
  JOSEPHS JACK, P.A.
  Grove Professional Building
  2950 S.W. 27th Avenue, Suite 100
  Miami, Florida  33133

ALSO PRESENT:
  CRICKET CANET, Paralegal
  Stephens, Lynn, Klein, Lacava, Hoffman & Puya, P.A.

**Page 3**

INDEX

Witness   Direct  Cross  Redirect  Recross
SCOTT FEDER
By MR. LOWE   4

EXHIBIT INDEX

| Defendant's | Description | Page No. |
|---|---|---|
| 281 | List of Privileged E-Mails | 14 |
| 282 | Accounting of Time | 38 |
| 283 | Subpoena Duces Tecum | 51 |
| 284 | Index of Documents | 86 |
| 285 | Handwritten Notes | 115 |

**Page 4**

1  Thereupon,
2          SCOTT JAY FEDER,
3  a witness named in the notice heretofore filed,
4  having been first duly sworn, deposes and says as
5  follows:
6          DIRECT EXAMINATION
7  BY MR. LOWE:
8      Q.  Good morning.  For purposes of the record,
9  please state your name and present business address.
10     A.  Scott Jay Feder, 4649 Ponce DeLeon
11  Boulevard, Suite 402, Coral Gables, Florida.
12     Q.  And Mr. Feder, you're a member of the
13  Florida Bar?
14     A.  I am.
15     Q.  Let me start the way we have started all
16  the others with identification of how we've been
17  referring to the various underlying entities.
18          I know that documents appear as NAUM or
19  NAUMIA.  I have been referring to those two as
20  either North American of Florida or North American
21  of Massachusetts and I intend to do it that way.
22  It's just easier than calling it NAUM or NAUMIA.
23  And Gersten, Gersten First American are easy enough.
24          Can you tell us the number of times you've
25  acted as an expert witness in a case?

**Page 5**

1      A.  More than two dozen times and less than 50
2  is the best I can state over my 25-year career as an
3  attorney.
4      Q.  Okay.  And of those retentions, how many
5  were as a standard of care witness as opposed to
6  testifying concerning fee issues?
7      A.  I believe I've been retained on standard
8  of care two or three other times.  It's possible
9  there have been more involvements, but none went
10  very far.
11     Q.  What do you mean by that?  That you were
12  retained and you just never reviewed documents and
13  gave testimony?
14     A.  Exactly.
15     Q.  Okay.
16     A.  Well, I did review documents and matters
17  for attorneys over the years in looking at matters
18  to be an expert, but for one reason or the other,
19  either the case resolved quickly or chose not to be
20  pursued, my involvement didn't go further.
21     Q.  Okay.  And the balance then of the 24 to
22  50 would have been on fee issue matters?
23     A.  Primarily.
24     Q.  And on fee issue matters, what percentage
25  would have been disputes between the attorney and

KRESSE & ASSOCIATES, INC
305-371-7692

**54**

```
 1    A.  Yes.
 2    Q.  When did you meet?  Did you meet with both
 3  of them or just one of the two?
 4    A.  I met with both of them and I've met with
 5  one of the two.
 6    Q.  That one of the two being Mr. Bales?
 7    A.  Yes.
 8    Q.  Okay.  When was your last meeting with
 9  Mr. Bales concerning this deposition?
10    A.  About a week ago.
11    Q.  Other than the conversations with
12  Mr. Bales and Mr. Nathan, what documents did you
13  review in preparation for your deposition over the
14  last week or ten days?
15    A.  I have tried to review all of my notes,
16  exhibits, indexes, the depositions, some of the
17  depositions, some law.
18    Q.  What law did you review?
19    A.  Cases that I provided to you.
20    Q.  How much time over the last ten days did
21  you devote to preparing for the deposition?
22    A.  Since I haven't been keeping time, I would
23  be estimating, but I would believe, approximately,
24  ten days, probably in the range of 20 hours or more.
25    Q.  Okay.  So it's a minimum of 20 hours.
```

**55**

```
 1  Tell me what the maximum would be.  And we're
 2  talking, really, from the period of 5-21?
 3    A.  That's ten days ago.
 4    Q.  Yeah, which is the last entry, so I don't
 5  have any time listed from your last statement.
 6    A.  I would imagine the range is somewhere
 7  between 15 and perhaps as much as 40 hours.  I don't
 8  think it's that much.
 9    Q.  So between 15 and 40 hours over the last
10  four days?
11    A.  Yes, sir.
12    Q.  Okay.  Exhibit 264.  Looking at 264 which
13  is the plaintiffs' expert witness disclosure.  You
14  were the first expert listed, and I'm only concerned
15  about the section of the document that relates to
16  your work.
17        Did you review the disclosure before it
18  was sent out at the end of October?
19    A.  Yes.
20    Q.  Okay.  Is there anything in here that you
21  disagree with?
22    A.  First of all, to be clear, I reviewed the
23  disclosure relating to my opinion alone, so I'm only
24  referring to my opinion.
25    Q.  I thought that was my predicate, that that
```

**56**

```
 1  was all we were talking about.
 2    A.  Okay.  As opposed to the other experts.
 3    Q.  Exactly.
 4    A.  Well, I disagree with the name in
 5  Section 1, subheading, Substance of Facts and
 6  Opinions C, I believe his name is Franklin Zemel and
 7  not Zemel Franklin.
 8    Q.  I don't see that -- Zemel.  Zemel Franklin
 9  for standard of care.  Okay.
10    A.  Other than that, I believe this is all
11  accurate.
12    Q.  Okay.
13        MR. LOWE:  Off the record.
14        (Thereupon, a discussion was held
15     off the record.)
16  BY MR. LOWE:
17    Q.  Other than the name of Mr. Zemel on Page 3
18  on the substance of facts and opinions, there's
19  nothing you disagree with or any changes you would
20  make?
21    A.  I would also say the timing when Mr.
22  Brodsky became lead counsel, which says here late
23  April.  That's the earliest possible time, and
24  probably he wasn't lead counsel, from my review,
25  until probably even after that date.  But I'm just
```

**57**

```
 1  being, you know, a little picky.
 2    Q.  Okay.
 3    A.  Everything else is accurate.
 4    Q.  Are there any other opinions that are not
 5  included here that you are prepared to testify to
 6  today, or at the time of trial?
 7    A.  These are the main opinions and opinion
 8  areas that I have been asked to render based on my
 9  review in the upcoming trial of this case.  I have
10  many sub-opinions related to all of this.  So I'd
11  have to say these two pages are simply a summary, in
12  essence, of my main opinions.
13    Q.  There are no other main opinions?  These
14  are the --
15    A.  I don't think so.
16    Q.  So there are three main opinions as to
17  Mr. Heidlage and Prince, Lobel, and then there are
18  four other opinions that you will testify to?
19    A.  Yes, sir.
20    Q.  And this is the major captions within each
21  of these categories are sub-opinions?
22    A.  Exactly.
23    Q.  I guess, I don't want to miss this,
24  because I can just see myself forgetting.
25        Tell me on the first one, "Mr. Feder will
```

KRESSE & ASSOCIATES, INC
305-371-7692

198

```
 1  IN THE CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT
         IN AND FOR MIAMI-DADE COUNTY, FLORIDA
 2            CASE NO. 03-10784 CA 30

 3

 4

    CHARLES N. ZALIS,
 5  individually, et al.,

 6       Plaintiffs,

 7  v.

 8  PRINCE, LOBEL, GLOVSKY &
    TYE, LLP, a Massachusetts
 9  limited liability partnership,
    et al.,
10
         Defendant.
11  _____/

12

13

                   VOLUME II
14

15           CONTINUED DEPOSITION

16                    OF

17

18        SCOTT JAY FEDER, ESQ.

19

20

21        9130 South Dadeland Boulevard
                 Miami, Florida
22

23

24           Friday, June 1, 2007
             9:15 a.m. - 1:10 p.m.
25
```

RECEIVED
JUN 1 3 2007
By_____

KRESSE & ASSOCIATES, INC
305-371-7692

Wednesday 20 of Jun 2007, KANFAXMP01          ->312 468 8001          Page 5 of 8

(Page 67 of 116)

---

**199**

APPEARANCES

For the Plaintiffs:

    RICHARD M. BALES, JR., Esquire
    BALES, SOMMERS & KLEIN
    One Biscayne Tower, Suite 1881
    Two South Biscayne Boulevard
    Miami, Florida 33131

Appellate Counsel for the Plaintiffs:

    MARTIN L. NATHAN, Esquire
    NATHAN & HAUSER
    700 Rivergate Plaza
    444 Brickell Avenue
    Miami, Florida 33131

For the Defendant, Richard Heidlage:

    JOSEPH H. LOWE, Esquire
    STEPHENS, LYNN, KLEIN, LACAVA,
    HOFFMAN & PUYA, P.A.
    Two Datran Center, PH II
    9130 South Dadeland Boulevard
    Miami, Florida 33156

For the Defendant, Prince, Lobel, Glovsky & Tye, LLP:

    JOSEPH W. BEASLEY, Esquire
    JOSEPHS JACK, P.A.
    Grove Professional Building
    2950 S.W. 27th Avenue, Suite 100
    Miami, Florida 33133

ALSO PRESENT:

    CRICKET CANET, Paralegal
    Stephens, Lynn, Klein, Lacava, Hoffman & Puya, P.A

---

**200**

INDEX

| Witness | Direct | Cross | Redirect | Recross |
|---------|--------|-------|----------|---------|
| SCOTT FEDER | | | | |
| By MR. LOWE | 201 | | 309,325 | |
| By MR. BEASLEY | | 268 | 328 | |
| By MR. NATHAN | | | 318 | |
| By MR. BALES | | | 321 | |


EXHIBIT INDEX

| Defendant's | Description | Page No. |
|-------------|-------------|----------|
| 286 | Affidavit of Scott Jay Feder | 309 |

---

**201**

1  Thereupon,
2      SCOTT JAY FEDER,
3  a witness named in the notice heretofore filed,
4  having been first duly sworn, deposes and says as
5  follows:
6      CONTINUED DIRECT EXAMINATION
7  BY MR. LOWE:
8      Q. Before we move on to the section, major
9  issues in the disclosure regarding the amended
10  complaint, I want to make sure that we have covered
11  all of your opinions and sub-opinions as it relates
12  to the expert witness.
13      My notes, or Cricket's notes was that,
14  sub-opinions as to why Mr. Heidlage did not
15  designate, Mr. Heidlage's excuses, the applicable
16  standard, how that caused damage and the
17  availability of experts.
18      Briefly, let's recap. In using those
19  bullet points. Tell us your opinion as to why you
20  believe Mr. Heidlage is not a designated expert?
21      MR. NATHAN: I'll object to the
22  form. Everything up to "tell us" is
23  fine.
24      THE WITNESS: I believe Mr. Heidlage,
25  for whatever reason, did not take the

---

**202**

1  Federal Court's deadlines as serious as
2  he should have. I believe he did not
3  spend the time and energy to seek out and
4  have an expert prepared and ready to go
5  forward.
6      And I believe he fell below the
7  standard of care in not doing so. I have
8  no other information from which to judge
9  what the reasons in his own mind were if
10  he actually had reasons as opposed to
11  simply letting the time go by and letting
12  it lapse for human procrastination, or
13  just laziness, or incompetence.
14  BY MR. LOWE:
15      Q. And in what period of time should he have
16  undertaken the effort to locate and designate an
17  expert?
18      A. Somewhere, without a doubt, in my opinion,
19  beginning in late summer, through and until
20  certainly the deadline of February 15th, and even
21  within a few week period thereafter.
22      Q. Okay. Do you know of any experts that
23  would have been available to be retained to testify
24  on behalf of Zalis during that time period?
25      MR. NATHAN: Objection to form.

---

KRESSE & ASSOCIATES, INC
305-371-7692

## 263

1  other areas, I think. Have we over the last day and
2  a half, covered all of your opinions as to what
3  Mr. Zemel did -- one of your opinions that Zemel
4  deviated from the applicable standard of care?
5      A.  Correct.
6      Q.  My question is, over the last day and a
7  half, have we covered the various issues that gave
8  rise to your opinion of his standard of care
9  deviation, or are there other matters that have
10  entered into your opinion as to what he did that
11  deviated from the standard of care?
12      A.  In all candor, I can't remember what we've
13  discussed in terms of Mr. Zemel in the last day and
14  a half, I'm sorry.
15      Q.  Then let's do it this way. Your opinion
16  as set forth in the disclosure was that, I'll
17  reverse it.
18          Frank Zemel departed from the applicable
19  standard of care.
20          Would you tell me the basis of your
21  opinion and what he did that was a deviation of the
22  standard of care?
23          MR. NATHAN:  Objection. Asked and
24  answered.
25          MR. BALES:  Well, it has been asked

## 264

1  and covered. Why cover the same thing
2  again?
3          THE WITNESS:  If they feel it's been
4  covered, I'll stand and agree that we've
5  covered it all.
6          MR. LOWE:  Well, then whatever he
7  said over the last day and a half, then I
8  don't have anything else.
9          MR. BALES:  I'm sorry. No, wait a
10  minute.
11          THE WITNESS:  On Mr. Zemel.
12          MR. BALES:  If you haven't covered
13  it, that's not our problem.
14          MR. LOWE:  Then it's not been asked
15  and answered then, has it?
16          MR. BALES:  We think it has been.
17  You have to make a decision whether it
18  has been or hasn't been.
19          MR. LOWE:  It may be, but I am not
20  going to know until I get the answer.
21          Would you read back my last question
22  to Mr. Feder?
23          THE WITNESS:  I know what the
24  question is.
25          MR. BALES:  We object. It's very

## 265

1  rarely it's called for. You can look and
2  see it.
3          THE WITNESS:  The essence of my
4  opinion regarding Mr. Zemel concerns the
5  failure to obtain an expert, or experts
6  during the brief time he was involved in
7  the case, and/or to seek additional time
8  from the Court within which to be able to
9  obtain an expert or experts. I think
10  that's the essence of my opinion
11  regarding Mr. Zemel.
12  BY MR. LOWE:
13      Q.  And did this deviation of the standard of
14  care cause damage to Mr. Zalis?
15      A.  This deviation caused some damage, but
16  it's hard to, and in my opinion, in all reality,
17  it becomes Mr. Heidlage's primary fault and
18  responsibility for all of that, because of the
19  way -- the brief period of time that Mr. Zemel was
20  in the case, and how the transition happened and
21  what occurred there, but it did cause some damage.
22      Q.  Okay.
23      A.  You know, I actually said that all wrong.
24          Mr. Zemel's deviation did cause damage.
25  But it's primarily the fault of Mr. Heidlage?

## 266

1      Q.  So we're talking about an allocation of
2  percentages?
3      A.  That would be up to the jury.
4      Q.  Yeah?
5      A.  Yes. This actually goes back to the
6  technical versus practical responsibilities of the
7  lawyers in charge.
8      Q.  And one of the other opinions is that
9  Kotin, Crabtree law firm did not depart from the
10  applicable standard of care under the circumstances
11  is that because they did not, Mr. Heidlage did not
12  become of counsel to that firm until May 1st of
13  2002?
14      A.  Exactly.
15      Q.  If Kotin, Crabtree did not deviate from
16  the standard of care as of May 1st, would you agree
17  that Mr. Heidlage did not commit any acts of
18  malpractice. Strike that.
19          Would you agree then that as of May 1,
20  2002, Mr. Heidlage did not deviate from the standard
21  of care?
22          MR. BALES:  As of May 1st.
23          MR. LOWE:  After May 1st.
24          MR. NATHAN:  Object to the form.
25          THE WITNESS:  The question is, after

## 267

1  May 1st, in my opinion, the dye was cast,
2  as an expression, the red lights had been
3  run, the accident had happened.
4  And so I guess I'm agreeing with
5  what you said that after May 1st, no,
6  there was no further malpractice at that
7  point that caused damage, that resulted
8  in damage.
9  BY MR. LOWE:
10  Q.  That's the basis of your opinion that
11  Kotin, Crabtree did not deviate from the standard of
12  care?
13  A.  Exactly.
14  MR. LOWE:  Let me have a moment.
15  (Thereupon, a brief recess was
16  taken.)
17  MR. LOWE:  At this point, I have no
18  further questions.
19  Pending a determination by the Court
20  as to the appropriateness of the
21  privilege log and the documents, and what
22  those documents contain, there may be
23  some additional questions.  But I won't
24  know that unless and until I see those
25  documents.  At this point we'll turn it

## 269

1  their behalf to handle the litigation solely on his
2  own.
3  Q.  Did you look at any documents reflecting
4  the relationship between Mr. Heidlage and the
5  Prince, Lobel firm?
6  A.  I did.
7  Q.  What documents?
8  A.  I saw, I believe it was either 199 -- I
9  believe it was a 1997 letter or memorandum from
10  Prince, Lobel outlining the relationship at
11  inception with Mr. Heidlage.
12  Q.  Let me show you what was marked as
13  Exhibit 1, it's actually an April 21, 1998 letter
14  and ask if this is what you're referring to?
15  A.  That is.  I knew it was '97 or '98.
16  Q.  Okay.  Other than this document, did you
17  find any other documents that pertain to the
18  relationship between Mr. Heidlage and Prince, Lobel?
19  MR. BALES:  Object to the form.
20  THE WITNESS:  I don't recall seeing
21  others.
22  BY MR. BEASLEY:
23  Q.  Did anyone tell you that anyone other than
24  Mr. Heidlage at Prince, Lobel was undertaking any
25  activities in regard to the Zalis case?

## 268

1  over to Prince, Lobel.
2  CROSS-EXAMINATION
3  BY MR. BEASLEY:
4  Q.  In your Exhibit 264 of your opinions, you
5  state that Prince, Lobel failed to meet the
6  applicable standard of care regarding -- then you
7  have the list we've been talking about.
8  What is the basis that you're stating that
9  Prince, Lobel failed to meet the applicable
10  standards of care you've listed in Exhibit 264?
11  A.  Primary basis is my belief that Richard
12  Heidlage and Prince, Lobel represented Mr. Zalis
13  Q.  Okay.
14  A.  -- during the time frame that we've been
15  discussing, and the Zalis plaintiffs.
16  Q.  Are there any acts of Prince, Lobel that
17  are not attributable to actions or omissions by
18  Mr. Heidlage that you claim Prince, Lobel did that
19  fell below the applicable standard of care?
20  A.  I have no knowledge of any specific acts
21  of anyone within the firm, the law firm, other than
22  Mr. Heidlage would have a belief that the law firm
23  should have had some supervisory, or other
24  involvement.  If there is a position on their part
25  that Mr. Heidlage was not capable and competent on

## 270

1  A.  No, sir.
2  Q.  Do you know where Mr. Heidlage was
3  initially hired in regard to the Gersten-Zalis
4  matters?
5  A.  I don't recall that.
6  Q.  Do you know where he, Mr. Zalis, initially
7  contacted Mr. Heidlage?
8  A.  No, sir, I don't remember.
9  Q.  Do you know whether there was a written
10  retention agreement between Mr. Zalis and Mr. Heidlage?
11  A.  I believe there was not.
12  Q.  Did Mr. Zalis ever tell you one way or the
13  other whether there was a written retention
14  agreement?
15  A.  I don't remember discussing that with
16  anyone.
17  Q.  Do you know whether there was any kind of
18  written retention agreement between Mr. Zalis and
19  the Prince, Lobel firm?
20  A.  I believe there was not.
21  Q.  Do you know how Mr. Heidlage was paid for
22  his services in regard to the Zalis matters?
23  A.  How he was paid?  In money, I believe.
24  Q.  Okay.
25  A.  But I don't know the specific forms.  I

KRESSE & ASSOCIATES, INC
305-371-7692

275

1  Q.  Heidlage and Prince, Lobel?
2  A.  Between the firm and Mr. Heidlage?
3  Q.  Um-hum.
4  A.  Absent any agreement in writing to apply
5  the law of some other forum, as between Mr. Heidlage
6  and the firm, I would have an opinion that the --
7  and not adding any other facts, but presuming that
8  it was an agreement entered into Massachusetts for
9  primary performance in Massachusetts, that law would
10  apply as between those two.
11      Without, by the way, without rendering any
12  opinion on Massachusetts law.
13  Q.  Are you aware of any representations by
14  Prince, Lobel to Mr. Zalis that Mr. Heidlage was
15  acting as their agent?
16  A.  In my opinion, the use of letterhead,
17  billing statements, and the use of the fact that
18  he's a lawyer in the firm, in and of counsel
19  relationship to me, holds out to the clientele, that
20  the professional is part of the law firm.  And the
21  law firm has responsibility for the professional.
22  Q.  If Mr. --
23  A.  And I might add, I'm sorry.  With the
24  sole, perhaps, exception if the client is in order.
25  Q.  Why would it make a difference if the

276

1  client was the lawyer?
2  A.  If the client was a lawyer and because of
3  the designation of counsel, I would expect the
4  lawyer to inquire further into the details of that
5  situation to determine if there's any issue in that
6  regard.
7  Q.  Would you expect a client to ask what the
8  difference between an of counsel lawyer and a lawyer
9  listed on the other side of the letterhead is?
10      MR. BALES:  Object to the form.
11      THE WITNESS:  No, I don't think that
12      would be reasonable.
13  BY MR. BEASLEY:
14  Q.  Why not?
15  A.  Because I don't think we, as professionals
16  and as lawyers, should expect clients to have any
17  interest or concerns in that regard if there is any
18  interest or concern on the professional's part.
19  It's our responsibility to disclose that to the
20  client, be up front about things like that.
21      It's, in my opinion, putting a burden on
22  the clients that should not be placed on them other
23  than if they are an attorney.
24  Q.  If Mr. Heidlage had explained to Mr. Zalis
25  that the nature of the of counsel relationship in

277

1  regard to this particular case was such that he had
2  to pay for any use of the firm assets that it was
3  not considered a firm case, and he got the money
4  less any costs that were due the firm for his use of
5  their resources, would you think that would change
6  the nature of the agent or apparent agent
7  relationship with Mr. Zalis?
8      MR. BALES:  Object to the form.
9      THE WITNESS:  No, that's not nearly
10      enough to change the nature of the
11      relationship in terms of the client.
12  BY MR. BEASLEY:
13  Q.  With respect to, I think Mr. Lowe went
14  over the various areas of deviations from the
15  standard of care that you've talked about.
16      When was the latest date that you believe
17  that a -- the latest date that you believe the acts
18  of malpractice occurred?
19  A.  Approximately, that first week of March,
20  in terms of the pleading.  And about the exact same
21  time in terms of expert witnesses.  And mainly end
22  of the year, or very beginning of -- end of 2001 or
23  very beginning of 2002 in terms of the injunctive
24  relief.
25      MR. LOWE:  Can I have that answer

278

1  back again, please?
2      (Thereupon, the answer was read.)
3      MR. LOWE:  I'm good.
4  BY MR. BEASLEY:
5  Q.  When, I believe you made -- you said like
6  the dye was cast or the damage was done.  When was
7  the damage done in regard to the injunctive relief?
8  When did Mr. Zalis suffer the damage from that
9  malpractice act?
10  A.  Well, I think I said the dye was cast, and
11  in terms of damages, the damages would be ongoing
12  throughout the case and flowing from each of these
13  acts, many of which the deviation existed, occurred
14  and then existed over applicable time frames.  The
15  ultimate damage occurred with what was occurring at
16  trial, um, and what necessarily happened as a
17  practical matter at that point in time, but the
18  damages were are ongoing.
19  Q.  In regard to the injunctive relief, when
20  was your understanding that the bonuses would have
21  been paid in, I guess it would have been for the
22  year 2001?
23  A.  I believe the bonus money, and I'm not --
24  as I said earlier, I'm not -- did not delve into the
25  details of all the different monies, but I believe